UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                                                      Case No. 1:14-CR-158

CHRISTOPHER TURRYLE BRYANT,              HON. PAUL L. MALONEY
                                                                                  Chief United States District Judge

       Defendant.

_____/

## GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in preparation for the sentencing hearing. The government relies on the facts presented at trial, as well as the facts described in the Presentence Report (PSR), which are not disputed. (ECF #39: PSR, Page ID #243.)

## DISCUSSION

The undisputed guideline range in this case is 360 months to life. (*Id.*, Page ID #243-44.) Of the five counts of conviction for sex trafficking three minor girls and one adult, both in Michigan and Arizona, the counts that carry the highest statutory penalty are Counts Two and Three. Those counts are for Bryant's sex trafficking of Y.W. (an adult) and S.C. (a minor) by force, fraud, or coercion. Those two counts each carry a statutory penalty of 15 years to life.

As the Court will recall from trial, the first victim who testified was Y.W., a woman in her young twenties when she met Bryant. Y.W. became pregnant and had a child. In applying for state support, Y.W. contacted Bryant in the summer of 2012 to take a paternity test. Bryant was living in Arizona at the time and traveled to Michigan to take the test. The test confirmed

1

Bryant was the father, and he and Y.W. started a relationship. The relationship turned violent. In one fight, Y.W. defended herself by hitting Bryant with a hammer, causing him to go to the hospital. But the relationship continued in a cycle of domestic violence. Y.W.'s children were taken away by the state, and Bryant told her in August 2012 that the two of them were going together to Arizona. He controlled Y.W.'s SSI benefits card, which acted as a debit card, and used it to buy tickets at the Grand Rapids bus station. Bryant had Y.W. buy his ticket under the fake name Don Richee. When they arrived in Phoenix, Bryant again had Y.W. take money out at an ATM using her SSI card, and he controlled the cash. They checked into a cheap motel.

Over the next two days, Bryant bought her a pair of ripped leggings and other clothes to walk the street, took her across the city, and made her walk the street for money. Bryant instructed Y.W. on how to walk and how to attract the attention of passing cars. Y.W. did not want to get into any of the cars because Bryant had not given her any condoms to use, and she told Bryant that she was turning down customers who stopped because they were not offering enough money. Bryant became irate. Back at the motel, Bryant violently raped her. Y.W. tried to escape out the bathroom window, but he pulled her back inside. He destroyed her cell phone, and she stayed in the motel room overnight, unable to leave. The next day, Y.W. escaped from Bryant at a McDonald's restaurant and literally ran for help. She got to the hospital and was taken to a women's shelter. She underwent a Sex Assault Nurse Examiner examination and reported the rape. After a brief time at the shelter, Y.W. made her way back to Michigan.

The Phoenix Police Officer who responded to the rape testified at trial. She remembered Y.W. and remembered her reporting the rape. She testified that the area of Phoenix that Bryant took Y.W. to prostitute was a high traffic, known prostitution area near a major intersection of interstate highways.

On December 26, 2013, Bryant's brother posted to Facebook a video of Bryant and two other men in a hotel bragging about pimping. The jury saw and heard the video, in which Bryant introduced a young woman as "one of [his] hoes," claimed to be "up to a thousand dollars a night," said he does "this pimpin' shit for real," and stated he was "really doing this shit for a living." He boasted about having two hotel rooms, the second of which he introduced as the "fucking domain." Bryant talked about how this was "pimping 101" and how this was "only the beginning."

In March and April 2014, the National Center for Missing and Exploited Children received two tips from someone who reported that her "teen sister" was in a prostitution advertisement on online and was "part of a child sex trafficking ring." The FBI investigated and located S.C., age 17, who reported that someone she met at a juvenile placement home recruited her into prostitution. S.C. became involved with Bryant and two others involved in a prostitution ring. The three of them put a prostitution ad of her online; took her to a cheap motel; and Bryant provided her with marijuana, alcohol, Xanax, and cocaine. In response to the online ad, men started showing up at the motel to have sex with S.C., and S.C. gave all the money to Bryant. Bryant later broke off from the other two individuals and took S.C. to another motel. There, S.C. stayed out one night past the time Bryant set for her to return, and Bryant choked her with his hands and yelled at her for "fucking for free." He told her he could "kill [her] and no one would know."

Between April and July 2014, Bryant recruited B.R., 16, to prostitute for him. B.R. was hanging around a bus station in Lansing, Michigan, and saw Bryant driving around in his car. She walked to a nearby convenience store parking lot, where she and Bryant spoke. B.R. initially thought Bryant wanted her to sell drugs with him. She went with him, and Bryant took

pictures of her in her bra and underwear, as well as topless, and posted them in a prostitution ad online. Bryant took B.R. to a motel, where men responded to the ad and had sex with B.R. for money. Bryant gave her rules, time limits, and prices to follow with the customers. Bryant also took her to a house in Lansing, where she performed "out-calls" with men who came to have sex with her, and she went outside or around the corner to meet them. Bryant told her they would split the money, but he never gave her any money. He gave her food, clothing, and drugs instead. B.R. got into a fight with Bryant eventually over the money, and Bryant threw her against the wall and choked her. B.R. grabbed a frying pan and hit him with it. B.R. was eventually arrested on an unrelated juvenile matter, and Bryant told a friend, who testified at trial, that he was going to get B.R. to work for him again when she got off tether.

Over July 4 weekend, 2014, Bryant picked up K.L., 17, near her home in Lansing. They met through Facebook, and Bryant talked to her about making money with him as a stippper or a prostitute. K.L. told Bryant she was 17 years old. Bryant asked her for pictures, which she sent, and which Bryant later used to post a prostitution ad of her online. Bryant took her on July 3, 2014, to a motel, where he and another woman told K.L. how to work as a prostitute. One man responded to the online ad and paid to have sex with K.L. at the motel. Bryant gave K.L. alcohol and drugs and took her to Detroit and back that weekend. K.L. maintained there was only one commercial sex act while she was with Bryant, which was in the motel in Lansing. At some point during the weekend, K.L. saw Bryant buy a prepaid gift card at a gas station convenience store and heard him tell a customer in the store that K.L. was prostituting for him. Several witnesses reported that Bryant paid for online prostitution ads using a prepaid gift card.

Two ex-girlfriends testified at trial, both of whom reported violent incidents with Bryant. When each of them refused to help Bryant by either prostituting themselves or helping him

manage the other girls, he pushed one of them towards the open trunk of her car, and the other one had to defend herself with a kitchen knife, stopped only by a family member coming in and breaking up the fight.  At least one of these women testified that Bryant also choked her.

During the testimony of one of these women, towards the end of trial, Bryant made an outburst in front of the jury when the government played the Facebook "Pimping 101" video. Bryant began yelling that the jury was going to "convict [him] anyway" and that this was "all just for all of [their] entertainment."  The jury and witness were rapidly escorted out of the courtroom, and Bryant was taken back to the United States Marshals' lockup in the courthouse. Through the wall of the courtroom, Bryant could be heard continuing to shout and bang.

Bryant's criminal history is extensive, and he qualifies as a Career Offender.  (ECF #39: PSR, Page ID #228-29, ¶ 79.)  His criminal history includes a long history of physical assaults and violence, including numerous domestic violence outbursts against multiple women resulting in visible swelling, bruising, and injury to their head.  (*Id.*, Page ID #233-37, ¶¶ 89-104.)  His adult history with law enforcement includes a high-speed chase in a stolen car (*id.*, Page ID #231, ¶ 85); dealing cocaine (*id.*, Page ID #231, ¶ 86); running from officers from inside a drug house (*id.*); spitting in the faces of two corrections officers who were removing him to an isolation cell for disorderly conduct (*id.*, Page ID #232, ¶ 88); and trespassing/home invasion into the homes of two ex-girlfriends (*id.*, Page ID #234, ¶ 90; Page ID #236, ¶ 101).

**SENTENCING FACTORS**

The nature and circumstances of the offenses against the four victims in this case are severe. (*See* 18 U.S.C. § 3553(a)(1).) Bryant used threats, violence, rape, drugs, and manipulation to try and get rich pimping. The government entered a number of photographs at trial from Bryant's Facebook page showing him holding large sums of cash in hotel rooms, and a close-up photograph of dollar signs tattooed across his face with the caption, "Money on ma mf*** mind!!!!" (punctuation in original). For Bryant, cash was king. He had been arrested previously and served time for dealing drugs. Dealing in young girls and women provided him the prospect of a potentially brighter financial future with less risk of being caught. Whereas being stopped on the street or found in a house or hotel with drugs by police is bad news, being found with teenage girls and young women is less obvious evidence of a crime. And, at "a thousand dollars a night," as Bryant claimed in his video, it is potentially more lucrative.

This case did not come to light until the FBI located and interviewed the first known victim, S.C., through the tip her sister made to the National Center for Missing and Exploited Children. These are not the types of crimes that teenage girls self-report, especially out of fear that they will get in trouble for being involved with drugs and prostitution. Had S.C. and the other victims not opened up to the FBI about the degrading experience of being sold to strangers for sex on a quarter-hourly basis, Bryant may never have been stopped. Bryant was betting on the girls and women staying silent, either out of fear or loyalty to him. When they faced him in the courtroom and testified against him, they proved that he bet wrong against them.

The crime of trafficking minors under 18 U.S.C. § 1591 does not require the use of force, threats, or violence, because minors cannot consent to prostitution. *See, e.g., United States v. Elbert*, 561 F.3d 771, 777 (8th Cir. 2009) (minor victims cannot legally consent to perform sex

acts under § 1591). But Bryant used force, threats, and violence liberally with most of the girls and women who testified at trial, including the minors. Sex trafficking also does not require crossing state lines, but Bryant's sex trafficking operation did. Bryant's chosen method of committing these crimes was serious and broad-reaching, endangering the lives and well-being of each of the victims. These crimes require a punishment that meets their severity. (*See* 18 U.S.C. § 3553a(2)(A).)

Bryant's entire criminal history demonstrates utter disregard for the law and for other human beings. His actions demonstrate that he treats others as a means to an end, and when they step out of line, he beats and assaults them. The punishment issued by the Court must promote respect for the law that Bryant has yet to understand. (*See id.*)

Bryant and others must be deterred. Perpetrators who seek to use girls and young women as commodities in their illegal dealings need to know that their crimes will be met with consequences. Although Bryant may never be deterred from crime or choose to lead a law-abiding life, a lengthy sentence will incapacitate him from committing additional crimes, at least while incarcerated, against girls and young women. Moreover, a lengthy sentence will indicate to others that pimping and sex trafficking are serious crimes, not the path to wealth, and carry the weight of a federal sentence behind them. (*See* 18 U.S.C. § 3553(a)(2)(B).) The fact that Congress made the maximum possible penalty for sex trafficking a life sentence – whether committed against minors or by force, fraud, or coercion – indicates Congress's intent to treat these crimes among the most severe under federal law. (*See* 18 U.S.C. § 1591(b)(1)-(2).)

A life sentence would not be disproportionate to Bryant's crime, and nor would it be inconsistent with the sentences imposed for similar crimes. For example, the cases highlighted below from the Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits affirm sentences from 30

7

years to life for pimps who, like Bryant, used a combination of drugs, alcohol, sex, money, and violence to control and manipulate girls and women into prostitution for the pimps' own financial gain.

For example, in *United States v. Williams*, 564 F. App'x 568, 569 (11th Cir. 2014), the court of appeals affirmed a sentence of five concurrent life terms after a five-count conviction for child sex trafficking and attempted child sex trafficking. Williams established relationships with runaway or foster care girls ages 12-16, some of whom had previously prostituted for other pimps. *Id.* He provided them with drugs and shelter in his home and made "several of the girls believe that their relationships with him were romantic and meaningful." *Id.* He told them to prostitute for him as a way to contribute to the household income. *Id.* The district court noted, in imposing the five concurrent life sentences, that Williams exploited or attempted to exploit "six minor girls, all of whom were demonstrably vulnerable, by having them engage in sexual acts for money." *Id.* at 578. At sentencing, the district court took stock that "Williams showed no remorse and continued to deny, up to and through sentencing, the charges against him." *Id.*

Likewise, in *United States v. Mozie*, 752 F.3d 1271, 1275-76 (11th Cir. 2014), the court of appeals affirmed a life sentence after a ten-count conviction for child sex trafficking, conspiracy to commit child sex trafficking, and production of child pornography in conjunction with sex trafficking. Mozie recruited vulnerable teen girls, many of whom were runaways, under the guise of running a modeling agency. *Id.* at 1275. He provided the minors with drugs, alcohol, and shelter in return for the girls providing sex for money to his customers at daily house parties he hosted at his home. *Id.* at 1275-76. Mozie called his sex trafficking business "Pretty Pink Pussy Enterprises" and made the minors fill out applications detailing the sexual scenarios they were willing to perform. *Id.* He often put them through "orientation," requiring

them to have sex with him, or with other men whom he could question later as to the girls' abilities. *Id.* at 1275-78. The court of appeals noted, in upholding Mozie's life sentence, that "[s]exual crimes against minors cause substantial and long-lasting harm" and "'[i]t has been found that sexually exploited children are unable to develop healthy affectionate relationships later in life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.'" *Id.* at 1289 (quoting *New York v. Ferber,* 458 U.S. 747, 58 n. 9 (1982)).

The Sixth Circuit has also upheld hefty sentences for pimps like Bryant. *See, e.g.*, *United States v. Daniels* 653 F.3d 399, 404-411 (6th Cir. 2011), *aff'd per curiam*, 555 F. App'x 598, 599 (6th Cir. 2014) (downward variance to 420 months affirmed for trafficking four minor ages 15-16 and one adult by force, fraud, or coercion); and *United States v. Willoughby*, 742 F.3d 229, 232 (6th Cir. 2014) (360-month sentence affirmed for 34-year-old "crack dealer and part-time pimp in Toledo" who trafficked 16-year-old runaway). The first federal sex trafficking case in the Western District of Michigan went to trial in April 2014 and is currently on appeal with the Sixth Circuit. *See United States v. Jackson*, 1:13-CR-246; 14-2208. Jackson received a sentence of 360 months for trafficking three minors, ages 14-16, on the streets in Grand Rapids.

Other circuits have also upheld significant sentences, besides those noted above, for pimps like Bryant. *See, e.g.*, *United States v. Sawyer*, 733 F.3d 228, 229-30 (7th Cir. 2013) (upholding a 50-year sentence for sex trafficking seven minor girls); *United States v. Cephus,* 684 F.3d 703, 703-708 (7th Cir. 2012) (affirming a life sentence for conspiracy to entice underage girls to engage in prostitution through the defendant's "escort service," transporting them in interstate commerce to engage in prostitution, the use of force and fraud to coerce adult women to engage in prostitution, and other related offenses); *United States v. Campbell,* 764 F.3d 880, 885-93 (8th Cir. 2014) (affirming convictions resulting in three life sentences and two

concurrent twenty year sentences for sex trafficking of two minors; sex trafficking by force, fraud, or coercion; interstate transportation for prostitution; and obstructing sex trafficking enforcement); and *United States v. Pringler*, 765 F.3d 445, 448-56 (5th Cir. 2014) (upholding a 405-month sentence for aiding and abetting sex trafficking a 16-year-old runaway girl who was caught by an undercover officer soliciting sex).

## CONCLUSION

The government respectfully requests that the Court impose a sentence at the high end of the guideline range for Bryant to reflect the seriousness of his predatory, self-serving sex trafficking scheme spanning two years. At only age 25, Bryant's violent history, defiant view towards law enforcement, and inability to respect fellow human beings indicate that he will continue to pose a danger to the public for a number of years to come. A high guideline sentence, including a life sentence, would be in line with the sentences in other federal sex trafficking cases across the country.

Respectfully submitted,

PATRICK A. MILES, JR.
United States Attorney

Dated: May 15, 2015

*/s/ Tessa K. Hessmiller*
TESSA K. HESSMILLER
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404